# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GLIDEPATH LIMITED and SIR KEN STEVENS, KNZM,

      Plaintiffs,

      v.

BEUMER CORPORATION, GLIDEPATH LLC, THOMAS DALSTEIN, and FINN PEDERSEN,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 12220-VCL

## MEMORANDUM OPINION

Date Submitted: November 26, 2018
Date Decided: February 21, 2019

Francis G.X. Pileggi, Gary W. Lipkin, Alexandra D. Rogin, ECKERT SEAMANS CHERIN & MELLOTT, LLC, Wilmington, Delaware; *Attorneys for Plaintiffs*.

Benjamin A. Smyth, McCARTER & ENGLISH, LLP, Wilmington, Delaware; William D. Wallach, McCARTER & ENGLISH, LLP, Newark, New Jersey; *Attorneys for Defendants*.

**LASTER, V.C.**

Glidepath LLC (the "Company") is a Delaware limited liability company. The plaintiffs sold the Company to defendant Beumer Corporation (the "Buyer") in a two-stage transaction. In the first stage, the Buyer purchased a 60% member interest in the Company from the plaintiffs and took over management of the Company's operations. A period of shared ownership followed. To complete the second stage, either party could exercise an option under a reciprocal put-call mechanism. The Buyer exercised its call and acquired the plaintiffs' remaining 40% member interest.

The bulk of the purchase price took the form of contingent payments based on the Company's performance over a three-year period. When the Company's performance did not warrant any additional payment, the plaintiffs filed suit.

The plaintiffs claim that the Buyer and the two individual defendants breached express provisions in the transaction documents and violated the implied covenant of good faith and fair dealing, which the plaintiffs say should result in an award of damages equal to the contingent consideration. This decision rejects those theories.

The plaintiffs also claim that the Buyer and its representatives breached their fiduciary duties while managing the Company. The plaintiffs again seek damages equal to the contingent consideration. This decision agrees that the Buyer and its representatives owed fiduciary duties to the Company and its members, but holds that those duties did not include any obligation to ensure that the plaintiffs received the contingent consideration. Recognizing that the Buyer and its representatives faced a conflict of interest when managing the Company because of the divergent incentives created by the Buyer's contractual obligations, this decision nevertheless holds that the Buyer and its

representatives properly sought to maximize the long-term value of the Company. The defendants' actions were entirely fair.

In a pre-trial ruling on a motion for summary judgment, the plaintiffs obtained an order finding that the Buyer breached the transaction agreements in three respects. The plaintiffs seek damages for those breaches. Two warrant only nominal awards. The third warrants damages of $377,282.57, plus pre- and post-judgment interest at the legal rate.

The plaintiffs' final claim is for breach of an exclusive territory provision. This provision binds the plaintiffs; it does not apply to the defendants.

## I.     FACTUAL BACKGROUND

Trial took place over four days. The parties submitted 354 exhibits and lodged eighteen depositions. Eight fact witnesses and two experts testified live at trial. The parties proved the following facts by a preponderance of the evidence.[1]

## A.     The Players

The Company designs, installs, and maintains baggage-handling systems at airports in the United States. Before the events giving rise to this litigation, the Company was a wholly owned subsidiary of Glidepath Ltd. ("Seller Parent"), which designs, installs, and maintains baggage-handling systems at airports around the world. Plaintiff Ken Stevens controls Seller Parent. This decision refers to Stevens and Seller Parent jointly as the

---

[1] Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX __ at __" refer to trial exhibits using the JX-based page numbers generated for trial.

"Sellers."

The Buyer designs, installs, and maintains baggage-handling systems at airports in the United States. The Buyer is a subsidiary of BEUMER Group GmbH & Co. KG ("Buyer Parent"), which designs, installs, and maintains baggage-handling systems at airports around the world. Dr. Christoph Beumer controls Buyer Parent.

At the risk of oversimplification, baggage-handling systems come in two types: traditional systems and next-generation systems. Manufacturers build baggage-handling systems using two measurement standards: the Imperial system and the metric system.

During the period relevant to the parties' dispute, traditional systems using Imperial measurements dominated the market for baggage-handling systems in the United States. American airports were slow to embrace next-generation systems, which have a higher upfront cost. Decision-makers at American airports also harbored skepticism about the reliability of next-generation systems, recalling the problems at the Denver International Airport when it attempted to implement one many years before.

Buyer Parent was a market leader in next-generation systems, but Buyer Parent had enjoyed its principal success outside of the United States. The Buyer had limited experience contracting in the United States and even less experience designing, supplying, and maintaining traditional systems that used Imperial measurements. As a result, the Buyer struggled to penetrate the American market.

The Company was skilled in designing, supplying, and maintaining traditional systems that used Imperial measurements, and it had established itself as a significant player in the US market. But the Company was struggling financially. To secure a job

3

installing or maintaining a baggage-handling system, a contractor typically must supply a performance bond. The contractor's financial strength determines the amount of bonding capacity it can obtain. The Company lacked the financial strength necessary to support significant bonding capacity, which limited the Company's ability to win jobs.[2]

During the fiscal year that ended on March 31, 2012, the Company suffered a net loss of approximately $4 million.[3] Because of these poor results, Stevens wanted to sell the Company.[4]

## B. The Buyer Approaches The Company.

In summer 2012, the Buyer contacted Stevens about the Company. The Buyer saw an acquisition as a means of expanding its American footprint.[5] The Buyer also believed that with its financial backing, the Company would be able to compete for larger jobs that could incorporate next-generation components.[6]

---

[2] *See* Stevens Tr. 14–15 (referring to bonding as "one of the big issues" and lamenting that the Company historically had "[f]ailed to realize the importance of securing the commensurate amount of bonding and the style of bonding that is unique to the U.S."); *see also* Bryan Tr. 606 (agreeing that prior to the transaction the Company "didn't have a lot of access to bonding").

[3] Hufnagel Tr. 768–69; *see* Barr Tr. 562–63.

[4] Stevens Tr. 11–12; *see* JX 7 at 3 ("The company went through some difficult times over the last three years, with heavy losses and a comprehensive restructuring program."). The Company faced other problems as well, such as going without a CEO from 2011 until 2013. *See* Stevens Tr. 129–31.

[5] *See* Stevens Tr. 13, 64; Barr Tr. 563–67; *see also* JX 4 at 9; Pedersen Tr. 887–88.

[6] *See* Dalstein Tr. 1096 (testifying that the "main reason" for the transaction was to take on American projects combining next-generation and traditional components); JX 4 at 9 (anticipating "strengthening of competitive position vis-à-vis current leaders in the

Stevens understood why the Buyer was interested in the Company, and he played up the Company's ability to help the Buyer meet its goals.[7] In a July 2012 presentation to the Buyer, Stevens argued that a post-acquisition Company could sell both traditional and next-generation systems.[8] His presentation identified thirteen large prospects that could involve next-generation systems, including a "Favored Project" at Denver International Airport worth $30 million and bigger projects in Boston and Newark.[9] Stevens argued that pursuing these projects had advantages, because "[c]ompetition is less intense at [the large-projects] level and correspondingly, margins are higher."[10]

---

market for >$20M BHS projects, together with jump-start of imperial format conveyor portfolio"); JX 6 at 2 ("Assume strategy in Airports is to win projects >$20m where we can offer 'new' technologies together with conveyors and, initially, only take 100% conveyor projects <$20M."); JX 10 at 2.

[7] *See* Stevens Tr. 141–46; JX 11 at 16, 22.

[8] *See* JX 11 at 18 (touting the Company's "plant and staff, complete product suite, effective sales force, essential contract and business licenses and market positioning to sustain a $40 million plus operation and extend Beumer's competitive positioning at both ends of the market"); *id.* at 22 ("The arrival of Beumer into the USA brings truly world-class equipment to the market in the high technology arena."); *id.* ("The ability to target the wider market and bid for higher scale projects will provide a distinct, appealing and valuable offering. It is in this area that synergies and benefits from consolidation can be sustained and will be realized which will enable the larger more capable organization to prosper."); Stevens Tr. 140–42; JX 4 at 7.

[9] *See* JX 11 at 24; *see also id.* at 26 (listing small and medium prospects).

[10] *Id.* at 16; *see id.* at 22 ("[The Company], with its reputation for excellence in completing small to medium sized projects, is capable of contributing strategic and competitive advantages to a larger entity such as Beumer which primarily operates at the higher end of the market where there are less players and the margins are better."); *see also* Pedersen Tr. 986–87.

But pursuing these projects would be a new frontier for the Company, which had a policy of not attempting projects valued at over $12 million.[11] Although the Company had captured roughly one-third of the American market for mid-sized projects in the $5–$10 million range, it historically could not compete for larger projects valued at over $20 million and had only taken on three projects in the $25 million category in its entire history.[12]

## C. The Terms Of The Transaction

Stevens offered to sell the Company for $5.5 million in cash. The Buyer thought it was worth much less. To bridge the valuation gap, the Buyer suggested an earn out.[13]

In January 2013, the parties reached an agreement in principle, memorialized in a

---

[11] *See* JX 11 at 14 ("The board of [the Company] restricts it to medium sized airport projects in the $1 million to $12 million price band."); Stevens Tr. 148–49 ("Q. It would have been difficult, if not impossible, to undertake more than one project greater than $12 million at the same time? A. Yes."); *see also* Hufnagel Tr. 737.

[12] JX 4 at 7–8; *see* JX 11 at 16.

[13] *See* JX 7 at 6 ("[The Buyer] proposed an initial investment of $1 million for 60% of the shares, via a three year earn out [Stevens] could receive another max. [$2.5 million] out of the retained earnings, if the company makes a profit. After the three year period both parties have a call/put option. Via this methodology the total purchase price after three years is max. [$6 million] and Glidepath owner is participating in this risk."); JX 6 at 2 ("What we know at this point $5.5m is much too high. $2.9m assets we also need to verify. Goodwill almost zero due to the losses."); Hufnagel Tr. 805 ("[The Buyer's and the Sellers'] evaluations and the expectations differed widely. This is why we came to the conclusion of doing an earnout."); *see also* JX 6 at 2 (considering whether the Buyer would have to "fund[] losses in 2012/13 and 2013/14" and suggesting plan "to at least break even next year after integration costs"); Barr Tr. 575 (discussing need for Sellers "to have some skin in the game").

term sheet, on a transaction that included a package of contingent consideration.[14] They hoped to close the transaction immediately after the Company's 2013 fiscal year, which ended in March.[15] With that goal in mind, they moved quickly to negotiate binding transaction documents.[16]

In a decision that would redound profoundly to their detriment, the Sellers did not formally involve outside counsel and did not retain counsel in the United States.[17] Stevens consulted at times with a New Zealand solicitor, but the solicitor did not play a meaningful role in the negotiations.[18] In substance, Stevens and his colleague, Wayne Collins, attempted to handle everything themselves, including both the business negotiations and the legal documentation.

The Buyer took a different approach. The Buyer's CEO, Dr. Thomas Dalstein, led the business negotiations. Buyer Parent's CFO, Norbert Hufnagel, assisted him. The Buyer's outside counsel took primary responsibility for drafting the deal documents.[19]

---

[14] JX 12.

[15] *See id.* at 3; Stevens Tr. 20; Barr Tr. 570.

[16] *See* JX 14 at 2–3 (email exchanges negotiating provisions and memorializing the Buyer's intention "to have the first drafts of the various agreements to you [the Sellers] around the 12th feb").

[17] *See* Stevens Tr. 119–20; Collins Tr. 221; Hufnagel Tr. 805.

[18] *See* Stevens Tr. 119.

[19] *See* JX 351 (draft agreements received from Buyer Parent's German counsel).

By the end of March 2013, the transaction documents were substantially complete.[20] The two principal documents were a Membership Interest Acquisition Agreement (the "Acquisition Agreement") and an Amended and Restated Operating Agreement (the "Operating Agreement"). The Acquisition Agreement governed the first-stage transaction in which the Buyer acquired a 60% member interest in the Company from Seller Parent. The Operating Agreement governed the internal affairs of the Company during a period of shared ownership, culminating in a second-stage transaction in which the Buyer completed the acquisition. The mechanism for the Buyer to acquire Seller Parent's remaining 40% member interest was a reciprocal put-call mechanism (the "Put-Call Option"). As between the parties, it was virtually inevitable that one side or the other would exercise the Put-Call Option. If the option price undervalued the remaining 40% member interest in the Company, then the Buyer would exercise its call. If the option price overvalued the remaining 40% member interest in the Company, then Seller Parent would exercise its put.

The Acquisition Agreement specified that in exchange for its 60% member interest, the Buyer would pay Seller Parent $1 million in cash at closing, plus two forms of contingent consideration. The first was an earn-out payment of up to $1.56 million (the "Earn Out") based on the Company's performance during "fiscal years 2014, 2015 and 2016" (the "Earn Out Period").[21] The second was a distribution equal to 40% of the

_____

[20] *See* JX 19 at 2; Stevens Tr. 125.

[21] JX 61 §§ 3.1.1, 3.2.1, 3.2.2.

8

Company's net profit during the Earn Out Period, up to a maximum of $1.04 million (the "Profit Distribution").[22] In combination, the Earn Out and the Profit Distribution entitled Seller Parent to an amount equal to the Net Profit during the Earn Out Period, capped at $2.6 million, with 60% of the Net Profit paid by the Buyer under the Earn Out and 40% paid by the Company through the Profit Distribution.

Through the Put-Call Option, the Operating Agreement provided for the balance of the contingent consideration. Regardless of which side exercised the option, the consideration consisted of a fixed payment of $400,000, plus a variable portion of up to $2 million tied to the Company's performance during the Earn Out Period.[23] In the aggregate, the consideration received by Seller Parent from the $1 million at closing, the Earn Out, the Profit Distribution, and the Put-Call Option could not exceed $6 million.[24] The Acquisition Agreement also provided that Seller Parent would receive payments pegged to the size of the Company's bank balance on two specified dates.[25]

This decision refers to the Earn Out, the Profit Distribution, and the Put-Call Option as the "Contingent Consideration." The parties typically referred to these components colloquially as the "earn out."

---

[22] *Id.* § 3.4.1. The Acquisition Agreement defined the "Net Profit" as "the profit of the Company remaining after taxes have been paid for the Company and its members." *Id.* at 6.

[23] *See* JX 65 § 8.3.3.

[24] JX 61 § 3.4.3.

[25] *Id.* §§ 3.1.3, 3.1.4.

During the period of joint ownership, the Operating Agreement established a manager-managed governance structure in which a single Manager would exercise "the powers of the Company," manage its "business and affairs," and "make all decisions and take all actions for the Company . . . ."[26] The Buyer had the right to appoint the Manager.[27] The Operating Agreement did not modify or eliminate the Manager's fiduciary duties. It did contain two internally inconsistent exculpatory provisions, one of which granted exculpation for breaches of the duty of care, while the other retained liability for gross negligence.[28]

Consistent with the manager-managed structure, the Operating Agreement provided that no individual member would have the right, power, or authority to act for or on behalf

---

[26] JX 65 § 5.1.3.

[27] *Id.* § 5.1.2.

[28] *Compare id.* § 5.4 ("The Manager of the Company shall not be personally liable to the Company or its Members for monetary damages for breach of the duty of care or other duty as a Manager; provided, however, that to the extent required by applicable law, this Section shall not eliminate or limit the liability or the Manager (i) for any appropriation in violation of his or her duties, of any business opportunity of the Company, (ii) for acts or omissions which involve intentional misconduct or a knowing violation of law, or (iii) for any transaction from which the Manager derived a personal benefit in violation or breach of any provision of any written agreement of the Company."), *with id.* § 6 ("Neither the Manager, nor any Member, nor any other officer of the Company shall have any liability to the Company or to any Member for any loss suffered by the Company which arises out of any action or inaction of any such Manager, Member or officer if such Manager, Member or officer, in good faith, determined that such course of conduct was in the best interest of the Company and such course of conduct did not constitute gross negligence or willful misconduct of such Manager, Member or officer.").

of the Company, or to take any action that would bind the Company.[29] Notwithstanding the otherwise plenary grant of authority to the Manager, two sections of the Operating Agreement specified lists of actions that the Manager could not take without member approval. The first section identified major actions that the Manager could not take without the affirmative vote of members holding a 75% member interest in the Company. These actions included matters such as dissolving the Company, amending its certificate of formation, changing the legal form of the company, and admitting new members.[30]

More importantly for the present case, a second section specified a list of operational activities that the Manager could not take without the prior written consent of members holding a majority interest.[31] The list identified the following items:

(i) The appointment and/or removal of the next management level

---

[29] *Id.* § 5.1.1 ("No individual Member has the right, power, or authority to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company."); *id.* § 5.1.3 ("No individual Member (other than in the capacity of the Manager or an officer acting pursuant to this Section 5) shall have the right, power, or authority to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company.").

[30] *Id.* § 5.2.2.

[31] *Id.* § 5.2.3. The provision states that these actions require "the prior, written consent of the Members . . . ." *Id.* The Operating Agreement stated that unless another section provided otherwise, "all decisions of the Members of the Company shall be decided by a majority of the votes cast (or by such greater percentage as may be required by the Act or other applicable laws)." *Id.* § 5.2.4; *see* 6 *Del. C.* § 18-402 (establishing default standard for member action requiring approval from holders of a majority of the interests in profits); *Obeid v. Hogan*, 2016 WL 3356851, at *18–20 (Del. Ch. June 10, 2016) (rejecting argument that comparable language required unanimous approval by the members).

11

below the Manager;

(ii) Any single capital expenditure or disposition above $10,000.00;

(iii) Any single contract above $3,000,000.00;

(iv) Entry into any project contract as to which the aggregate liability of the Company is not capped at an amount of 50% or less of the contract value;

(v) Any bid bond above $200,000.00 and any performance bond above $2,000,000.00;

(vi) Any cash-negative project with an aggregate negative cash position of $1,000,000.00 at any point in the contract;

(vii) Any project with a gross profit level below 10%;

(viii) Any material deviation from the Business Plan; and

(ix) Entering any agency or representative agreements.[32]

Notably, the Operating Agreement provided that for purposes of this list of actions, the members had delegated their voting rights to Dalstein, who had "the power to act on their behalf . . . and . . . shall take on their behalf any action otherwise required to be taken by the Members . . . ."[33] As a result, Dalstein had the ability to veto any of the identified actions by blocking them at the member level. Equally important, Dalstein had the ability to authorize the Manager to take any of these actions, because the Operating Agreement provided that once the necessary member vote had been obtained, "then any such decision or consent shall constitute a decision or action by the Manager . . . and shall be binding on

---

[32] JX 65 § 5.2.3 (formatting added).

[33] *Id.* § 5.2.5.

12

each Manager, Member, officer and employee of the Company . . . ."[34] This decision refers to the members' ability to veto or authorize material operational activities, with Dalstein controlling the outcome, as the "Member Authorization Provision."

Dalstein's ability to veto or authorize operational matters under the Member Authorization Provision diminished the protection afforded to the Sellers by the only other limitation in the Operating Agreement on the Manager's authority: compliance with the Company's business plan (the "Business Plan"). The Operating Agreement provided that

> [t]he Manager shall prepare an updated Business Plan for the Company on a calendar year or fiscal year basis. Such Business Plan (the "***Business Plan***") shall set forth all material activities of the Company in reasonable detail, provide a budget and specify strategic plans of the Company for the ensuing year. The Manager shall at all times act within the Business Plan and within the Manager's limits of authority set forth therein.[35]

But by exercising his delegated authority under the Member Authorization Provision, Dalstein could authorize a "material deviation from the Business Plan."[36]

The Operating Agreement only called for the members to meet once per year, although any member holding at least a 10% member interest (*viz.*, either of them) could call a special meeting on not less than 10 days' nor more than 60 days' notice. The Operating Agreement specified that at any meeting of members, the Buyer would be represented by Dalstein, Hufnagel, and Beumer. The Sellers would be represented by

---

[34] *Id.* § 5.2.1.

[35] *Id.* § 5.1.3.

[36] *Id.* § 5.2.3(viii).

13

Stevens and Collins.[37] The parties have referred to this group as the "Advisory Board."

The Operating Agreement imposed only one affirmative obligation on the Buyer: "[The Buyer] shall support the Company with the realization of the Business Plan by way of its bonding line."[38] Otherwise, neither the Operating Agreement nor the Acquisition Agreement identified any actions that the Buyer or Buyer Parent had to take to enhance the likelihood that the Sellers would receive the Contingent Consideration.

## D.    The Buyer Postpones The Closing.

In spring 2013, the Buyer postponed the closing. Buyer Parent wanted the Buyer to be able to fund the $1 million payment due at closing out of cash on hand, which the Buyer was not yet able to do. Buyer Parent also wanted the Buyer to have an individual ready to take over as Manager, but the Buyer had not yet identified a suitable candidate.[39]

Stevens recognized that the postponement could affect the Contingent Consideration, particularly because the Company continued to struggle financially.[40] After two years during which the Company's CEO position had gone unfilled, Collins took over

---

[37] *Id.* § 7.6.5.

[38] *Id.* § 2.5.

[39] Hufnagel Tr. 765–66; *see also* Hufnagel Dep. 105–09.

[40] *See* JX 21 at 2 (Stevens writing in May 2013: "[C]racks are appearing in the structure, staff are looking to us to make decisions and we need to increase our sales effort."); *id.* at 3 ("I am worried about time drifting on, staff in Dallas looking to me for leadership. And I need to protect my earn out."); *see also* JX 47 at 4 (Stevens discussing delayed closing's implications for purchase price); JX 50 at 5 (Stevens discussing "very soft" 2013 sales performance).

as acting CEO in June 2013, but he had no prior experience running an American baggage-handling company.[41] On his watch, the Company experienced significant cost overruns.[42] Ultimately, 2013 fell short of expectations.

## E. The Transaction Closes.

By November 2013, the Buyer had accumulated the cash necessary to fund the closing payment. The Buyer also had identified defendant Finn Pedersen, an individual affiliated with Buyer Parent, as the Manager.[43] With these requirements met, the parties targeted a closing in January 2014.[44]

On January 10, Collins sent signature pages to Stevens to be signed and held in escrow pending closing.[45] When the Buyer's counsel continued to make minor comments on the agreements, Collins complained to Dalstein: "Enough is enough, we have our commercial agreement based on the mutual trust between us, let's get on with it."[46]

On January 16, 2014, Collins released the signature pages from escrow, and the

---

[41] Stevens Tr. 129–31.

[42] JX 29 at 2.

[43] *See* JX 37 at 2; Hufnagel Tr. 810–12.

[44] *See* JX 39 at 2.

[45] JX 52 at 2.

[46] JX 60 at 2.

transaction closed.[47] Neither Stevens nor Collins reviewed the documents again.[48] Stevens was on vacation and relied on Collins.[49]

## F. Early Indications Regarding The Buyer's Strategy

Soon after the deal closed, the Sellers received indications that the Buyer intended to reorient the Company towards larger projects that offered higher profit margins, the ability to negotiate terms and conditions, and the potential inclusion of next-generation components. That should have come as no surprise to the Sellers, because the Buyer had made clear during the deal negotiations that it wanted to pursue these goals, and Stevens had pitched the Company to the Buyer as a means of achieving them.

The first indication involved a project for a traditional baggage-handling system at John Wayne Airport in Orange County, California.[50] When the deal closed, the Company was preparing its bid and needed a performance bond. The Buyer tried to obtain a bond through the Company's broker, but could not secure enough capacity without a guarantee from Buyer Parent.[51] Buyer Parent decided that "a parent-company guarantee should be

---

[47] JX 62–63.

[48] Stevens Tr. 28–29; Collins Tr. 221–23, 261.

[49] Stevens Tr. 29–30.

[50] Barr. Tr. 710.

[51] JX 56 at 3–4; *see* JX 67.

16

avoided"[52] and asked the Buyer to look at international options for bonding.[53]

After analyzing the terms of the John Wayne bid, the Buyer concluded that the project was too risky. The terms and conditions were non-negotiable, and the key to success was making the lowest bid, which squeezed the profit margin.[54] Dalstein decided that the Company would not bid on the project—which he had the power to do under the Member Authorization Provision.[55] Collins became upset, because historically the Company had bid on projects like the John Wayne opportunity.[56] Collins objected that if the Company changed its strategy, then "it could have serious repercussions [for the] Earn Out."[57]

On January 29, 2014, after meeting with the bid team, Dalstein reversed course.[58] The Company obtained bonding from Buyer Parent and ultimately won the bid.[59]

The second indication involved Denver International Airport. When the deal closed,

---

[52] JX 56 at 3; *see* JX 70.

[53] *See* JX 56 at 4 ("In the future aim should be to keep the liability for US business in USA."); *see also* JX 77 at 4.

[54] *See* JX 69; JX 75 at 2–3.

[55] JX 75 at 2–3.

[56] *See id.* at 2.

[57] *Id.*

[58] JX 78; JX 81; *see* Dalstein Tr. 1127–29.

[59] JX 140 at 3; JX 299 at 27; *see* JX 348; *see also* Graviet Tr. 361 ("Q. This is an instance where the buyer listened to the specific recommendation, deferred to the people in Dallas [*i.e.*, management], and the bid was successfully submitted; right? A. Yes.").

Denver was preparing to solicit bids for the major baggage-handling project that Stevens had identified as a "Favored Project" when pitching the Buyer on the Company.[60] Collins did not believe the Company should bid, and he omitted the Denver opportunity from a spreadsheet that identified the Company's pipeline and backlog.[61] The Buyer proposed adding Denver and a similar project at San Francisco International Airport, noting that each would include both a next-generation component and a traditional component.[62]

## G.    Pedersen Takes Over.

In mid-February 2014, Pedersen took over from Collins and assumed the position of Manager under the Operating Agreement.[63] By early March, Stevens and Collins felt left in the dark. They were accustomed to total control over the Company, but now Pedersen was running the show.[64]

Pedersen encouraged Dalstein to meet with Collins and reach agreement on how the Company would be operated. Dalstein pointed out that the Buyer owned 60% of the member interests and had the authority to operate the business. He recognized that "important decisions" would require "a common understanding" between the Sellers and

---

[60] *See* JX 81 at 3.

[61] JX 93; *see also* JX 97 (discussing which prospects required bid bonds).

[62] JX 94.

[63] Stevens Tr. 130–31.

[64] *See* JX 101.

the Buyer, but stressed that it was the Buyer and Pedersen who managed the business.[65]

One of Pedersen's first tasks was to update the Business Plan that was incorporated by reference in the Acquisition Agreement (the "Acquisition Plan").[66] The Buyer and the Sellers had jointly developed the Acquisition Plan during their negotiations in early 2012, before the closing was delayed. It consisted of a one-page spreadsheet, with columns for each fiscal year from 2013 through 2016, and rows labeled order intake, secured sales, revenue, contribution margin, indirect expense, gross margin, SG&A, and EBIT.[67] The plan divided the projected sales figures into four categories: "BHS Large projects (>\$15M)," "BHS Small projects (<\$15M)," "BHS Manufacturing," and "CSS Service & Support." For FY 2014, the plan anticipated an order intake of \$25 million from large projects and \$16 million from small projects. For FY 2015, the plan anticipated an order intake of \$35 million from large projects and \$12 million from small projects. Four explanatory bullet points appeared the bottom of the page:

- "Revenue figures are [Company] stand-alone and do not include revenue from tote, DCV, or tilt tray systems" (*i.e.*, next-generation systems);

- "Revenue growth driven by complementary applications with BEUMER Group Logistics—Airports technologies and after-market (customer support/service) / base load development";

- "Margin quality improvement driven by prize realization (i.e., market selectivity), cost-savings and process synergies, and mix development (i.e., after-market / base

---

[65] JX 111.

[66] *See* JX 61, Schedule 4.2(v).

[67] JX 61 § 4.2(v); *see id.* at Schedule 4.2(v); *id.* § 1.2.5 ("The Schedules form an integral part of this Agreement and are incorporated by reference.").

load development)"; and

- "EBIT growth driven by margin quality improvement and BEP (break-even point) development."[68]

Dalstein wanted Pedersen to prepare a new plan that took into account the delayed closing and observed that "[b]asically we can move all numbers by almost one year."[69] Pedersen worked on the new plan with Eddie Perez, the Company's CFO, and Christopher Bryan, the Buyer's CFO. They initially developed a plan that called for growth in EBIT of 1.2% in 2014 with accelerated growth in 2015 and beyond,[70] but they worried that Stevens and Collins would object to the plan because the projected results would not generate the maximum Contingent Consideration.[71] Perez modified the plan to contemplate more aggressive results in 2015, but the plan still would not achieve the near-term results required to maximize the Contingent Consideration.[72]

Pedersen presented the new Business Plan at the first meeting of the Advisory Board, which took place on March 25, 2014. The plan projected Net Profit of $290,096 in 2014, and $2,083,737 in 2015.[73] Compared to the Acquisition Plan, the new Business Plan

---

[68] *Id.* at Schedule 4.2(v).

[69] JX 113 at 2.

[70] JX 116 at 5.

[71] *Id.* at 4.

[72] *See id.* at 2–3.

[73] JX 117 at 26.

emphasized the Company's long-term prospects.[74] Stevens and Collins expressed concerns about the plan, including the inclusion of integration costs. They objected that the Buyer was treating the Company as if it was "suddenly 100% BEUMER."[75]

The Advisory Board held another meeting on May 22–23, 2014. The year-to-date financial results were poor.[76] Stevens and Collins felt that the Company was turning down jobs that it historically would have pursued. The Buyer felt the Company was making sound business decisions by emphasizing larger projects with the potential for higher margins and negotiable terms and conditions.[77]

## H. The Chicago Project

An opportunity at O'Hare International Airport in Chicago suited the Company's new strategy: It was valued at $20–30 million, offered higher margins, and the terms and

---

[74] *See id.* at 11, 13, 17, 31, 33.

[75] JX 125 at 4; *see also* JX 101 (Collins complaining that "the integration has all the feel of the integration of a 100% owned Beumer subsidiary when of course it is a 50/50 joint venture for the next three years."); Stevens Tr. 175 (testifying that the Company was "intended to be all along for the full three years of the earn-out a 50-50 . . . joint venture, maybe not financially but 50-50 in control"). Collins and Stevens misunderstood the deal they had agreed to in the Operating Agreement. The Company was a 60/40 joint venture in which the Buyer had control, both by virtue of its right to appoint the Manager and through the Member Authorization Provision.

[76] JX 147 at 7; JX 148 at 5.

[77] *See* JX 153.

conditions were negotiable.[78] But in June 2014, after Pedersen and the Company had been working on the Chicago bid for a month, problems emerged.[79] The work needed to be completed on a faster schedule, and to meet it, the Company would have to preorder parts before the bid was awarded. The pre-award purchases would set up the Company for a loss if its bid failed.[80]

After these problems emerged, Pedersen decided not to bid on the project.[81] Collins objected and asserted that declining to bid the job required Advisory Board consent.[82] That was not correct. The Advisory Board had no authority over whether or not to decline a bid. Instead, because of the size of the project, the Member Authorization Provision gave Dalstein authority to either veto or authorize the bid. Pedersen correctly informed Collins that he only had to report to Dalstein on these matters.[83]

I.      **Disagreements Over Strategy**

In July 2014, the Company's Vice President of Sales, Michael Baggett, complained privately to Collins that the Company "had been forced to decline to bid over $100 million

---

[78] *See id.* (Dalstein: "With Chicago we have the chance to kill many birds with one stone: low risk, high margins, T & C negotiable, relaxed schedule, a subcontractor . . . doctors the union at the airport and we can create volume, utilization and reputation.").

[79] *See* JX 142; JX 143; JX 146; *see also* JX 158.

[80] JX 160; JX 166; *see* Pedersen Tr. 951.

[81] JX 166.

[82] *See* JX 165 at 3–4; *see also* JX 136 at 4.

[83] *See* JX 165 at 2; *see also* JX 136 at 3.

in business over the past 30 days because [Buyer Parent] didn't want to waste their bonding capacity on us."[84] But as the Sellers' witnesses conceded at trial, the Company could not bid on all of its prospects.[85] The Company had to select the most promising opportunities, and Pedersen and Dalstein preferred different types of opportunities than what the Company traditionally had pursued.[86]

In August 2014, Baggett griped to members of management that the Company was not working hard enough to pursue an opportunity involving traditional systems at Palm Beach International Airport.[87] The Company pursued and won the project, which became the largest pure-play traditional project in the Company's history.[88]

Internally, some members of the Buyer's team empathized with the Sellers regarding the changes in the Company's management and direction.[89] But they also described the serious problems with the Company's historical approach, including a lack

---

[84] JX 190 at 2.

[85] Stevens Tr. 149; Graviet Tr. 288.

[86] JX 136 at 2–3.

[87] *See* JX 205 at 2.

[88] *See* JX 205 at 2. *But see* JX 169 at 4 (Stevens identifying three older projects valued at roughly $25 million "in today's value").

[89] *See* JX 210 at 4; JX 216.

of meaningful financial oversight.[90]

On September 10, 2014, the Advisory Board held its third meeting. Pedersen reported on the Company's activities, projecting a worst-case scenario for the year of $24 million in sales with a best-case scenario of $80 million.[91] One lowlight of the year was that the Company had been forced to decline several bidding opportunities due to its efforts to win the Denver project.[92] The Company invested heavily in the Denver opportunity, both because Pedersen understood from meetings with stakeholders that it was "ours to lose,"[93] and because the Denver project would involve a traditional component valued at $60–70 million and a next-generation component valued at $30–40 million.[94] Stevens understood the significance of the Denver project and was excited about the opportunity.[95]

**J.      The Sellers Learn That An Earn Out Payment Is Unlikely.**

By November 2014, the Buyer and Pedersen had determined that the Company was unlikely to produce enough Net Profit for the Sellers to receive any Contingent

---

[90] *See* JX 204 at 2 (observing that the Company had not "ever had a strong financial manager that demanded a significant presence in the business"); JX 194 at 3 (noting problem of "pay[ing] too much for the value we receive for labor or materials or both").

[91] JX 212 at 31.

[92] *See* JX 219 at 7–8.

[93] JX 119; *see* Pedersen Tr. 1003–05.

[94] JX 157 at 3; *see* JX 130 at 3; JX 137; JX 138; JX 150.

[95] *See* JX 227.

Consideration.[96] They decided that they needed to inform the Sellers.

The next meeting of the Advisory Board meeting was scheduled for November 19, 2014. Pedersen prepared a presentation that explained "the earn out, the situation and the different scenarios."[97] The presentation showed that the Company had incurred a net operating loss of $1.56 million for the fiscal year that ended on March 31, 2014.[98] It forecasted continuing losses for the fiscal year ending March 31, 2015. The presentation forecasted modest gains in 2016, but projected they would be inadequate to generate a cumulative Net Profit since the closing of the acquisition.[99] Anticipating that the presentation would not be well received, the Buyer had counsel review the deck.[100]

During the November 2014 meeting, the Sellers learned for the first time that they were unlikely to receive any Contingent Consideration. Stevens was "shocked,"[101] and his demeanor was "icy."[102] He did not raise any objections to the analysis.[103]

Four months later, in March 2015, Stevens asked to meet with Beumer. In his email,

---

[96] *See* Hufnagel Tr. 830–31, 839–40.

[97] JX 226 at 2.

[98] JX 239 at 33.

[99] *Id.*

[100] *See* JX 238 at 2; JX 241 at 2.

[101] Hufnagel Tr. 845–46.

[102] *Id.* at 833.

[103] *Id.* at 833–41.

25

Stevens emphasized that he needed to "achieve the earn out" and had "relied heavily on the strength and reputation of Beumer Corporation."[104] Beumer responded that

> in all fairness, [the Company] was definitely not in the shape [Collins] always communicated and made us [] believe. The earn out based on the 2014 numbers will not be achievable anymore as planned. . . . I definitely want to find a fair solution but we both also have to acknowledge that the numbers turned out to be different at the end as we all wanted them to be.[105]

Beumer's answer infuriated Stevens, and he sent back an angry email filled with criticisms of the Buyer.[106]

After exchanging several heated emails, Beumer and Stevens agreed it was best to meet in person.[107] They met in Dallas on April 29, 2015.[108] The meeting was short and unsuccessful.

## K.    This Litigation

On September 18, 2015, the Sellers commenced an arbitration against the Buyer. On April 1, 2016, while the arbitration remained pending, the Buyer exercised its call option. On April 15, the Sellers filed their complaint in this action and a motion seeking to

---

[104] JX 268 at 3.

[105] JX 280 at 9.

[106] *See id.* at 8 ("In any case . . . you are running an international company having acquired several companies, you had [the Company] under scrutiny for 16 months while due diligence went on.").

[107] *Id.* at 2.

[108] Dalstein Tr. 1120.

enjoin the exercise of the call. On April 22, I denied the motion.[109]

The parties agreed to forego the arbitration and litigate in this court.[110] The Sellers filed an amended complaint that asserted claims against the Buyer for breach of the Acquisition Agreement, breach of the Operating Agreement, and breach of the implied covenant of good faith and fair dealing. It asserted claims for breach of fiduciary duty and civil conspiracy. The complaint also sought reformation of the dates governing the Earn Out Period.

In November 2017, the Sellers moved for partial summary judgment. By order dated January 5, 2018, I granted the motion as to specific claims for breach of contract (the "Summary Judgment Order").[111]

After trial, I directed the parties to present the reformation issue first, because the outcome of that issue determined the relevant time periods for the other contractual claims. In a memorandum opinion dated June 4, 2018, I rejected the Sellers' claim for reformation.[112] That decision directed the parties to brief the remaining post-trial issues, including the quantum of damages for the claims addressed on summary judgment.

While this litigation was pending, the Company achieved success in Denver and San Francisco. If either project had come through earlier, it singlehandedly could have

---

[109] *See* Dkt. 18 at 43–54.

[110] *See* Dkt. 2 at 2 n.2.

[111] Dkt. 147.

[112] *Glidepath Ltd. v. Beumer Corp.*, 2018 WL 2670724 (Del. Ch. June 4, 2018).

resulted in full payment of the Contingent Consideration. Instead, due to events beyond the parties' control, both arrived after the Earn Out Period.

## II.    LEGAL ANALYSIS

The Sellers raise a series of claims. They first contend that the defendants operated the Company in a manner that deprived the Sellers of the Contingent Consideration. The Sellers assert that the Buyer and its representatives operated the Company in a manner that (i) breached the express terms of the Operating Agreement, (ii) violated the implied covenant of good faith and fair dealing, and (iii) constituted a breach of fiduciary duty. As damages, the Sellers seek the full value of the Contingent Consideration. This decision rejects those theories.

The Sellers also seek remedies for three breaches of contract that they established through a motion for summary judgment. Two of the breaches warrant awards of only nominal damages. The third warrants damages of $377,282.57, plus pre- and post-judgment interest at the legal rate.

Finally, the Sellers claim that the Buyer breached an exclusive territory provision. This claim fails because the provision binds the Sellers, not the Buyer.

### A.    Breach of Contract

In their first theory, the Sellers contend that the Buyer and its representatives operated the Company in a manner that deprived the Sellers of the Contingent Consideration. The Sellers assert that the defendants' business decisions constituted a breach of the express terms of the Operating Agreement and the implied covenant of good faith and fair dealing.

28

### 1. The Express Terms Of The Operating Agreement

"Delaware adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party."[113] When interpreting a contract, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement," construing the agreement as a whole and giving effect to all its provisions.[114] "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[115] "The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."[116]

The Sellers contend that the Buyer breached the express terms of the Operating Agreement in three ways. First, the Sellers claim that the Buyer failed to support the

---

[113] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014).

[114] *GMG Capital Invs., LLC v. Athenian Venture P'rs I*, 36 A.3d 776, 779 (Del. 2012); *see Elliot Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998) ("It is well established that a court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument."); *City Inv. Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993) ("If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent.").

[115] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[116] *GMG Capital*, 36 A.3d at 779.

Company with its bonding line. Second, the Sellers claim that the Buyer breached a recital that required the Buyer to contribute its "skills, expertise, collateral and interests" to the Company. Third, the Sellers contend that Pedersen breached the Operating Agreement by failing to manage the Company in conformity with the Acquisition Plan.

### a. Bonding

Section 2.5 of the Operating Agreement states: "[The Buyer] shall support the Company with the realization of the Business Plan by way of its bonding line."[117] The Sellers contend that the Buyer breached this provision by failing to provide sufficient bonding capacity for the Company to win jobs. The Sellers maintain that with more bonding capacity, the Company could have won more jobs and generated financial results that would have supported a full payment of the Contingent Consideration.

The Buyer did not have its own bonding line until well into the Earn Out Period.[118] Until it secured its own line, the Buyer obtained bonds through Buyer Parent.[119] The Sellers

---

[117] JX 65 § 2.5.

[118] *See* Bryan Tr. 635–36 (testifying that the Buyer acquired a bonding line in 2015); Dalstein Tr. 1117–18 (explaining that the Buyer obtained a $30 million bonding line in 2016).

[119] *See* JX 91 (February 2014 email discussing ACE and other Buyer Parent bonding lines for the Buyer to use); JX 133 at 2 (Baggett in April 2014: "[The Company] currently [has] a 5/20 bonding line with Capitol Indemnity ($5M single project/$20M aggregate), but aside from that we rely on the BEUMER line to pursue future works."); JX 189 (Bryan in July 2014: "[The bond producer] strongly feels [the Buyer] will not get an offer for a bonding program without the parent indemnity."); *see also* JX 208 at 3 (September 2014 letter denying the Buyer prequalification to bid on Denver contracts because of the Buyer's inadequate financial capacity); JX 225.

contend that Buyer Parent refused to provide bonding for traditional projects because it wanted to save its bonding capacity for next-generation projects. The Sellers also argue that the Buyer should have done more to obtain guarantees from Buyer Parent.

The Sellers' argument about bonding capacity fails because the Operating Agreement did not impose an obligation on Buyer Parent. It only imposed an obligation on the Buyer. The obligation that the Buyer undertook did not include any commitment to cause Buyer Parent to take affirmative actions to provide bonding. Because of the structure of the Operating Agreement, Buyer Parent's refusals to provide bonding for particular jobs could not give rise to breach.[120] The plaintiffs proved that Buyer Parent was risk averse when making bonding decisions.[121] But the Operating Agreement did not obligate Buyer Parent to provide bonding, nor did it obligate the Buyer to cause Buyer Parent to provide

---

[120] *See Alliance Data Sys. Corp. v. Blackstone Capital P'rs V*, 963 A.2d 746, 765–69 (Del. Ch.) (Strine, V.C.), *aff'd*, 976 A.2d 170 (Del. 2009) (TABLE).

[121] *See* Graviet Tr. 297–315; *see also* Baggett Dep. 24–29 (identifying disputed no-bid decisions); Collins Tr. 225 ("You can overbid a job simply by overestimating the risk. And I don't think Beumer had a good grasp particularly of consequential damages. They hated them."); Graviet Tr. 307–08 (explaining attempts to explain to the Buyer that terms and conditions regarding "consequential damages, liquidated damages for delay" are "common," "you don't have to worry about it," and "if you have a good relationship with the [project] owner, they'll generally work with you if things happen"); JX 179 at 2 (Graviet in June 2014: "[R]egarding the T&C's that are not negotiable, I will write down my thoughts about how likely (how risky) those T&Cs really are."). *Compare* JX 169 at 2 (Stevens explaining to Pedersen that "most contractual disagreements don't get to court and are generally settled amicably by [the Company's] own staff and the owner/general contractor on the other side. Foreigners don't understand this and appear scared of it."), *with* JX 174 at 3 (Pedersen opining that Stevens is "a 'bigger risk taker' than BEUMER and probably also bigger than me").

bonding. The Buyer only had to support the Company with its own line.

The Sellers' argument also depends on the premise that Section 2.5 of the Operating Agreement obligated the Buyer to support the Acquisition Plan and achieve the results it projected. Section 2.5 in fact refers to the "Business Plan," which the Manager was obligated to update every year. Through that process, the Company shifted its strategy away from its historical focus on smaller-sized jobs involving exclusively traditional technology in which the lowest-cost provider won the bid and towards larger jobs involving both traditional and next-generation components that offered higher profit margins.

The Operating Agreement allowed that shift. Indeed, Stevens convinced the Buyer to buy the Company by arguing that the Company could help the Buyer secure larger, more complex jobs. Even the Acquisition Plan had contemplated that the Company would pursue projects that combined next-generation and traditional technology.[122] There was no mandate to pursue projects involving exclusively traditional systems.

The Sellers contend that the Company's lack of bonding capacity forced it to turn down opportunities. There is some evidence that supports their position.[123] But the

---

[122] *See* JX 61, Schedule 4.2(v).

[123] *See, e.g.*, JX 270 (Bryan remarks on Cleveland opportunity in 2015: "WHAT??? IS??? GOING??? ON??? How can we not get a bid bond?"); JX 285 at 2 (Pedersen discussing problems arising from lack of American bonding line); *see also* JX 223 at 2 (Baggett opining that the Company failed to bid multiple projects in 2014 because of "limited bonding capacity," "schedule conflicts, lack of engineering resources, [and] overall risk assessment from [the Buyer]"); JX 174 at 2 (Buyer officer posing "a basic question: do we have sufficient resources/staffing to go after profitable projects for the [Company's] 'core business' (i.e., Acquisition Business Plan projects) ***and*** to support projects that complement/support development of the BEUMER group portfolio (e.g.,

evidence does not show that the Buyer failed to support the Company with its bonding capacity, such as it was. The Buyer sought in good faith to obtain greater bonding capacity from Buyer Parent,[124] and Buyer Parent did provide bonding on multiple occasions, including for strictly traditional projects. Examples include the traditional projects at John Wayne and Palm Beach, which collectively had a value of $35 million.[125]

The Buyer did not breach its contractual obligation to support the Company with its bonding capacity. The Buyer did not support every bid that some at the Company wanted to make, but the Buyer had legitimate reasons for doing so.

### b. The Efforts Claim Against The Buyer

The recitals to the Operating Agreement contain language in which the parties described their intent to made the Company a success. Preamble E states:

> It is the intention of the Members that, through the Company, the Members will apply their joint skills, expertise, collateral and interests in building a single baggage handling systems operation in the territories of the United States, Mexico and the Bahamas, with the joint aim of becoming a dominant force in baggage handling systems in such territories.[126]

The Sellers argue that the Buyer failed to contribute its "skills, expertise, collateral and

---

Denver, SFO, Seattle, …)? Both are critically important."; Pedersen responding that "[t]he answer to resources is NO"); Pedersen Tr. 1022–23 (explaining that the Company lacked the resources to pursue Palm Beach and Chicago simultaneously).

[124] JX 274 (Bryan requesting "a larger, more substantial bonding facility in the US"); JX 56 at 4; *see* JX 70; JX 133 at 2; *see also* JX 91; JX 106 ("Now with the [Company's] bonding capacity increased we are [pursuing] a large amount of work again.").

[125] *See* JX 348.

[126] JX 65 at 2.

interests" to the Company. The Sellers effectively seek to convert the recital into an efforts clause that required the Buyer to strive to achieve the results necessary to trigger the Contingent Consideration. The Sellers claim that the Buyer breached this obligation by focusing on projects involving next-generation components, where the Company could not take a leading role.

"Generally, recitals are not a necessary part of a contract and can only be used to explain some apparent doubt with respect to the intended meaning of the operative or granting part of the instrument. If the recitals are inconsistent with the operative or granting part, the latter controls."[127] Preamble E is a recital. It does not establish a substantive obligation.

Regardless, the Buyer would not have breached an obligation to devote its "skills, expertise, collateral and interests" by focusing on large next-generation projects. These projects had large traditional components. The traditional component in the Denver project, for example, was larger than any project in the Company's history. The traditional component in the San Francisco project more than twice the size of Denver's. If the Company had landed either project, then the resulting business could have been sufficient to trigger all of the Contingent Consideration.[128]

---

[127] *New Castle Cty. v. Crescenzo*, 1985 WL 21130, at *3 (Del. Ch. Feb. 11, 1985) (citation omitted); *accord Creel v. Ecolab, Inc.*, 2018 WL 5778130, at *4 (Del. Ch. Oct. 31, 2018); *UtiliSave, LLC v. Miele*, 2015 WL 5458960, at *7 (Del. Ch. Sept. 17, 2015).

[128] *See* Dalstein Tr. 1080–82 (discussing San Francisco project's $66 million conventional aspect, with a "gross margin . . . by far higher than all the planned gross margin the acquisition business plan"); Pedersen Tr. 1013 (discussing allocation of $30

The Buyer properly devoted its "skills, expertise, collateral and interests" to the Company by focusing on these projects. The Company eventually achieved success in Denver and San Francisco, but only after the Earn Out Period. If the timing had worked out better, the decision to focus on those projects would not have caused a dispute. It is only with the benefit of hindsight that the Sellers can now attempt to challenge the business decisions that the Company made. But the fact that those decisions did not pan out does not mean that the Buyer failed to devote its "skills, expertise, collateral and interests" to the Company. The evidence shows that it did.

### c. Failure To Comply With The Business Plan

Section 5.1.3 of the Operating Agreement provides that "[t]he Manager shall at all times act within the Business Plan and within the Manager's limits of authority set forth [in the Operating Agreement]."[129] The Sellers claim that Pedersen failed to cause the Company to adhere to the Acquisition Plan, resulting in a breach of this provision that led to the failure to generate the financial results necessary to yield the Contingent Consideration.

As noted, Section 5.1.3 does not require compliance with the Acquisition Plan. It

---

million of Denver project's value to the Buyer); JX 207 (September 2014 memorandum anticipating Q2 2015 start to Denver work with monthly progress payments and an 18% gross margin); *see also* Collins Tr. 255 ("If the first year had been like the second and third year, we wouldn't be sitting here right now, I don't think."); Dalstein Tr. 1123; Pedersen Tr. 1005–1012 (describing protracted Denver bidding process and the Buyer's eventual success after it made a joint bid with an electrical company); JX 341 at 24; JX 322.

[129] JX 65 § 5.1.3.

requires compliance with the Business Plan, which Pedersen updated. The Sellers have not challenged Pedersen's compliance with the updated Business Plan. Moreover, under the Member Authorization Provision, Dalstein had sole authority to authorize departures from the Business Plan.[130] Pedersen consistently sought Dalstein's consent before he did anything that even resembled a deviation from the Business Plan.[131] The Sellers have not pointed to action that Pedersen took that failed to comply with the Business Plan *and* which Dalstein failed to authorize.

### 2. The Implied Covenant

In addition to their arguments that invoke the express language of the Operating Agreement, the Sellers contend that the Buyer violated the implied covenant of good faith and fair dealing by failing "to use best efforts to reach an earn out provision."[132] According to the Sellers, the Buyer breached the implied covenant by instead taking action designed to frustrate the Sellers' ability to receive the Contingent Consideration.

Invoking the implied covenant "is a 'cautious enterprise' that 'is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions.'"[133] "Delaware's implied duty of

---

[130] *See* JX 65 §§ 5.2.3(viii), 5.2.5.

[131] *See* JX 104 at 3; JX 132; JX 146 at 2; JX 314 at 2; *see also* JX 164.

[132] Dkt. 197 at 52.

[133] *Oxbow Carbon & Minerals Hldgs. v. Crestview-Oxbow Acq., LLC*, --- A.3d ---, 2019 WL 237360, at *19 (Del. Jan. 17, 2019) (footnote omitted).

good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract."[134]

"[B]ecause the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue."[135] "Even where the contract is silent, '[a]n interpreting court cannot use an implied covenant to re-write the agreement between the parties, and should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'"[136] "Parties have a right to enter into good and bad contracts, the law enforces both."[137]

The Sellers have not identified a gap in the governing documents. The Operating Agreement grants the Buyer expansive rights over the Company. The Buyer appoints the Manager, who oversees the business and affairs of the Company and makes the operational decisions relating to its business.[138] Although the members held some consent rights over operational matters, the Member Authorization Provision gave Dalstein the ability to veto

---

[134] *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010).

[135] *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE).

[136] *Oxbow*, 2019 WL 237360, at *19 (alteration in original).

[137] *Nemec*, 991 A.2d at 1126.

[138] *See* JX 65 §§ 5.1.2, 5.1.3.

or authorize those actions.[139] In Section 5.2.2 of the Operating Agreement, the Sellers retained their ability to vote on extraordinary matters, but the Sellers have not alleged a violation of that provision.

Given these provisions, there is no gap for the implied covenant to fill. The Manager had authority under the Operating Agreement to implement the strategy that he considered best for the Company's overall success.[140] Likewise, Dalstein had authority to authorize or veto specific operating decisions that he favored or disfavored. "A party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party."[141]

## B.    Breach Of Fiduciary Duty

Separate from their contractual theory, the Sellers argue that the defendants breached their fiduciary duties by engaging in a "bad-faith scheme to raise costs, lower profitability, divert opportunities, and to employ Company resources to pursue [next-generation] projects for the primary benefit of the Buyer (and to the detriment of the Company)."[142]

---

[139] *Id.* §§ 5.2.3, 5.2.5.

[140] During negotiations, Collins wondered what might happen if the Buyer failed to provide bonding. He suggested that if the failure to bond caused the Company to lose a project, the Sellers should be made whole by an adjustment to the Net Profit calculation. JX 19 at 2. The final transaction documents did not implement Collins's suggestion.

[141] *Nemec*, 991 A.2d at 1128.

[142] Dkt. 197 at 42.

38

The Company was a manager-managed LLC. The Operating Agreement did not eliminate or modify the principles of equity that impose fiduciary duties on whose who control an enterprise. Consequently, Pedersen owed fiduciary duties in his capacity as Manager.[143] The Buyer owed fiduciary duties as a controlling member.[144] Because Dalstein had the power to cause the Buyer to act and personally wielded the powers granted by the Member Authorization Provision, he owed fiduciary duties as well.[145]

---

[143] *See* 6 *Del C.* § 18-1104 ("In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern."); *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2018 WL 3646817, at *21 (Del. Ch. July 31, 2018); *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *1 n.3 (Del. Ch. July 6, 2018); *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2014 WL 4374261, at *12 (Del. Ch. Sept. 4, 2014); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 660–63 (Del. Ch. 2012). *See generally CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684, at *11 & n.54 (Del. Ch. Apr. 21, 2015).

[144] *See CMS Inv. Hldgs. v. Castle*, 2015 WL 3894021, at *18 (Del. Ch. June 23, 2015); *Feeley*, 62 A.3d at 662 ("Managers and managing members owe default fiduciary duties; passive members do not."); *Kelly v. Blum*, 2010 WL 629850, at *1 (Del. Ch. Feb. 24, 2010) ("[E]ven though contracting parties to an LLC agreement have the freedom to expand, restrict, or eliminate fiduciary duties owed by managers to the LLC and its members and by members to each other, in the absence of a provision explicitly altering such duties, an LLC's managers and controlling members in a manager-managed LLC owe the traditional fiduciary duties that directors and controlling shareholders in a corporation would."); *see also 2009 Caiola Family Tr. v. PWA, LLC*, 2015 WL 6007596, at *26 (Del. Ch. Oct. 14, 2015).

[145] *See Renco Gp., Inc. v. MacAndrews AMG Hldgs.*, 2015 WL 394011, at *7 (Del. Ch. Jan. 29, 2015); *Feeley*, 62 A.3d at 670–72 (explaining that the "human controllers of an entity fiduciary" owe at least a duty of loyalty to a managed entity with respect to transactions involving its property); *In re USACafes, L.P. Litig.*, 600 A.2d 43, 48 (Del. Ch. 1991) (Allen, C.) ("[O]ne who controls property of another may not, without implied or express agreement, intentionally use that property in a way that benefits the holder of the

When determining whether a fiduciary has breached its duties, Delaware law distinguishes between the standard of conduct and the standard of review.[146] The standard of conduct describes what the fiduciary is expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether a fiduciary has met the standard of conduct.[147]

In terms of the standard of conduct, the duty of loyalty requires that fiduciaries act in the best interests of their beneficiaries.[148] To satisfy the standard of conduct, fiduciaries must act in good faith, meaning they must subjectively believe that they are advancing the

---

control to the detriment of the property or its beneficial owner."); *see also 2009 Caiola Family Tr. v. PWA, LLC*, 2014 WL 7232276, at *9 n.57 (Del. Ch. Dec. 18, 2014).

[146] *See Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of* Van Gorkom *and Its Progeny as a Standard of Review Problem*, 96 Nw. U.L. Rev. 449, 451–52 (2002); William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function Over Form: A Reassessment of the Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1295–99 (2001); *see also* E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992–2004? A Retrospective on Some Key Developments*, 153 U. Pa. L. Rev. 1399, 1416–25 (2005) (distinguishing between the standards of fiduciary conduct and standards of review). *See generally* Julian Velasco, *The Role of Aspiration in Corporate Fiduciary Duties*, 54 Wm. & Mary L. Rev. 519, 553–58 (2012); Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Fordham L. Rev. 437, 461–67 (1993).

[147] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35–36 (Del. Ch. 2013).

[148] *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) ("[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.").

interests of their beneficiaries.[149] And fiduciaries must in fact pursue the interests of their beneficiaries, rather than succumbing to conflicting or divergent interests. Fiduciaries who make decisions based on their private interests violate the standard of conduct.[150] Fiduciaries also must make decisions prudently and carefully, in compliance with the duty of care.

By default, a Delaware LLC exists perpetually—from formation until cancellation.[151] Consequently, unless their fiduciary duties are eliminated or modified, the fiduciaries who control a Delaware LLC must strive to maximize the value of the LLC over a long-term horizon, as warranted for an entity with a presumptively perpetual life. This duty is not the same thing as acting to ensure the LLC's perpetual existence. A fiduciary

---

[149] *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . .") (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006)); *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) (Allen, C.) (defining a "bad faith" transaction as one "that is authorized for some purpose *other than* a genuine attempt to advance corporate welfare or is *known to constitute* a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

[150] *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

[151] 6 *Del. C.* § 18-201(b).

might readily determine that a near-term sale or other shorter-horizon initiative is value-maximizing even when judged over the long term.[152]

The fiduciary principle does *not* require that fiduciaries maximize the value of a beneficiary's contractual claim against the firm. A holder of a contract claims must rely on its contractual rights. When making a decision, fiduciaries can and should consider its implications for contractual claimants and evaluate what actions those claimants may take in response. Based on this analysis, fiduciaries may decide not to pursue a particular course of action because of the resulting implications for the firm and its residual claimants.[153] But fiduciaries do not owe duties to contractual claimants.[154] To the contrary, a fiduciary

---

[152] *See Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 791 n.60 (Del. Ch. 2004) (Strine, V.C.) (explaining that sometimes fiduciaries must take action in a context where preserving the firm as an independent entity would not be value-maximizing).

[153] *See, e.g.*, *Orban v. Field*, 1997 WL 153831, at *9 (Del. Ch. Apr. 1, 1997) (Allen, C.) ("Certainly in some circumstances a board may elect (subject to the corporation's answering in contract damages) to repudiate a contractual obligation where to do so provides a net benefit to the corporation."). *See generally Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *23–24 (Del. Ch. Apr. 14, 2017), *as corrected* (Apr. 24, 2017).

[154] *See, e.g.*, *Simons v. Cogan*, 549 A.2d 300, 303 (Del. 1988) ("[A] convertible debenture represents a contractual entitlement to the repayment of a debt and does not represent an equitable interest in the issuing corporation necessary for the imposition of a trust relationship with concomitant fiduciary duties."); *Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 75 (Del. 1969) (holding that former preferred stockholders who received debentures and a share of common stock were not owed fiduciary duties in their capacity as debenture holders and had only their contractual rights as creditors); *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 2173838, at *7 (Del. Ch. May 28, 2010) ("[R]ights arising from documents governing a preferred class of stock, such as the Certificates, that are enjoyed solely by the preferred class, do not give rise to fiduciary duties because such rights are purely contractual in nature."); *MCG Capital Corp. v. Maginn*, 2010 WL

42

violates the standard of conduct if the fiduciary seeks to maximize the value of a contractual claim at the expense of the fiduciary's beneficiaries.[155]

In this case, the Company's fiduciaries had a duty to act in good faith to maximize the value of the Company over the long term. The Company's fiduciaries did not have a duty to maximize the value of the contract claim to the Contingent Consideration. The Sellers' argument that the Company's fiduciaries had a duty to maximize the value of the Contingent Consideration fails for want of a valid premise. In their capacity as holders of a contractual claim to the Contingent Consideration, the Sellers had to rely on their contract rights. They were not entitled to fiduciary protection.

Although this straightforward version of the Sellers' claim fails as a matter of law, a subtler version requires further analysis. The structure of the Contingent Consideration

---

1782271, at *15 (Del. Ch. May 5, 2010) ("[D]irectors do not owe preferred shareholders any fiduciary duties with respect to [their contractual] rights.").

[155] *See Revlon, Inc. v. MacAndrews & Forbes Hldgs.*, 506 A.2d 173, 182 (Del. 1986) ("[T]he Revlon board could not make the requisite showing of [fiduciary] good faith by preferring the noteholders and ignoring its duty of loyalty to the shareholders. The rights of the former already were fixed by contract."); *Blackmore P'rs v. Link Energy LLC*, 864 A.2d 80, 85–86 (Del. Ch. 2004) ("[T]he allegation that the Defendant Directors approved a sale of substantially all of [the company's] assets and a resultant distribution of proceeds that went exclusively to the company's creditors raises a reasonable inference of disloyalty or intentional misconduct. Of course, it is also possible to infer (and the record at a later stage may well show) that the Director Defendants made a good faith judgment, after reasonable investigation, that there was no future for the business and no better alternative . . . . [I]t would appear that no transaction could have been worse for the unit holders and reasonable to infer . . . that a properly motivated board of directors would not have agreed to a proposal that wiped out the value of the common equity and surrendered all of that value to the company's creditors.").

caused the Buyer's incentives to diverge from the interests of the Company. The Buyer was obligated to pay the Earn Out and the consideration for the Put Option. Although the Profit Distribution nominally came from the Company, it was part of the package of consideration paid to eliminate the Sellers from the Company. These payment obligations created a conflict of interest for the Buyer as a fiduciary, because by depressing the Company's performance during the Earn Out Period, the Buyer could minimize the Contingent Consideration and benefit itself. Dalstein was a fiduciary for the Buyer, so he shared the conflict. Because Pedersen managed a firm controlled by the Buyer and could be removed by the Buyer at will, he was beholden to the Buyer, and the conflict affected him as well.

The resulting conflict did not arise because the defendant fiduciaries owed duties to the Sellers. The defendant fiduciaries owed duties to the Company and all of its equity holders. But when making decisions about how to maximize the value of the Company for the benefit of all of its equity holders, the defendant fiduciaries faced a conflict because of the Buyer's competing contractual obligations.

To determine whether fiduciaries have breached their duties, a court applying Delaware law deploys a standard of review. Delaware's default standard of review is the business judgment rule.[156] But when the firm's fiduciaries face a conflict of interest that undermines their ability to make disinterested and independent decisions, the applicable

---

[156] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

standard of review is the entire fairness test. When entire fairness governs, the fiduciaries must establish "to the *court's* satisfaction" that their actions were "the product of both fair dealing *and* fair price."[157] An honest belief that the action was fair is necessary but not sufficient. The course of action "must be objectively fair, independent of the [fiduciaries'] beliefs."[158]

Consistent with the fiduciary principle, the entire fairness standard measures the course of action by its success in promoting the value of the firm. The question in this case is whether the Buyer, Dalstein, and Pedersen acted to maximize the value of the firm over the long run. They did not have a duty to maximize the Contingent Consideration, nor did they have a duty to maximize the returns to the Sellers. They had a duty to maximize the long-term value of the firm.

The Sellers contend that the Buyer, Dalstein, and Pedersen breached their fiduciary duty to maximize the long-term value of the firm by "disloyally engaging in a scheme to depress revenues, increase expenses and divert business opportunities for their own benefit."[159] The defendants proved that they acted fairly. They subjectively believed that they were promoting the long-term value of the firm, and they proved at trial that their actions had that effect.

---

[157] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995).

[158] *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

[159] Dkt. 197 at 2.

The Sellers contend that the Buyer, Dalstein, and Pedersen focused the Company on large-scale projects to ensure that the Company would not achieve the results necessary to trigger the Contingent Consideration. The evidence showed that the Buyer, Dalstein, and Pedersen focused the Company on large-scale projects because it was a sound business strategy. These projects offered higher profit margins and the potential to mitigate liability risk by negotiating terms and conditions. The Company also faced less competition and could compete across dimensions other than lowest price. These projects included large traditional components. The defendants convinced me that focusing on these projects would maximize the value of the Company over the long run.

The Sellers also argue that the Buyer diverted opportunities from the Company by making it a subcontractor for certain projects, instead of placing the Company in the more lucrative general contractor role. Their sole example is Denver, where Collins conceded that the Company "would not near have qualified to be the main contract."[160] Because next-generation technology anchored the Denver project, the Company could not act as the general contractor. It is true that for a brief period, the Buyer and Dalstein considered hiring one of the Company's competitors as a subcontractor for the Denver job, and Dalstein joked that he would "fill out the divestment form for [the Company]."[161] They evaluated this option because Buyer Parent wanted the Buyer to pick the subcontractor that was best

[160] Collins Tr. 253.

[161] JX 231 at 2.

46

for the Buyer's bottom line, even if that meant using a competitor.[162] If Dalstein had followed through, that likely would have resulted in a breach, but the issue became moot when the Buyer subcontracted the work to the Company.

The Sellers contend that Pedersen breached his duties by causing the Company to incur costs for integration. In particular, they object to $700,000 for training the Company's employees in next-generation technology. The Business Plan contemplated these costs. As fiduciaries, the Buyer, Dalstein, and Pedersen were not obligated to maintain the Company's historical business practices during the Earn Out Period; they were obligated to take steps to maximize the long-term value of the firm. Engaging in employee training promoted long-term value, as did the broader efforts to integrate the Company's business with the Buyer's.[163]

The Buyer, Dalstein, and Pedersen proved that they acted at all times to promote the long-term value of the Company. Although their course of conduct did not maximize the value of the Contingent Consideration, they had no fiduciary obligation to protect the value of a contractual claim. The Buyer, Dalstein, and Pedersen proved that for purposes of fiduciary duty analysis, their conduct was entirely fair.

---

[162] *See* Dalstein Tr. 1091–1101.

[163] *See* JX 117 at 11, 17, 33, 40–41.

47

## C. The Claims Addressed On Summary Judgment

In addition to their principal claims for the Contingent Consideration, the Sellers sought at trial to address three other breaches of contract: (i) the Buyer's unauthorized loans to the Company, (ii) the Buyer's failure to prepare draft audited financial statements, and (iii) the Buyer's failure to pay amounts equal to the Company's bank balance at specified dates. In each case, the Sellers previously moved for summary judgment, and the Summary Judgment Order ruled in favor of the Sellers on the issue of breach. The questions remaining for trial included the Buyer's affirmative defenses (principally waiver and acquiescence) and the quantum of damages. In post-trial briefing, the Buyer recast its affirmative defenses as reasons why the Sellers failed to prove damages, so this decision focuses on that issue.

### 1. Unauthorized Loans

The Summary Judgment Order ruled that the Buyer breached the Operating Agreement by making loans to the Company without Seller Parent's consent. Section 2.2 of the Operating Agreement states:

> Additional capital contributions to the Company (each, an "***Additional Capital Contribution***") shall be made only by [the Buyer]. [Seller Parent] shall not be required to make additional capital contributions to the Company. If the Manager determines that the Company needs additional funding and obtains the prior written consent of both Members thereto, then such funds shall be provided by [the Buyer] either (as [the Buyer] and the Company may agree) (i) in the form of an Additional Capital Contribution to be reflected by an increase in the Capital Account of [the Buyer], or (ii) as a loan documented by a note (for which the Company shall execute a separate

48

security agreement, the form of which shall be approved by the Members).[164]

In February 2014, the Buyer began making informal loans to the Company.[165] No one formally notified the Sellers or sought the members' consent, but Stevens discovered the loans in May 2014. The loans continued for years, totaling over $5.7 million by the end of the Earn Out Period.[166]

To recover damages, Sellers had to prove at trial that they suffered actual harm from the breach. The Sellers did not try to meet this burden. Instead, they argued that they could have extracted management concessions in return for their consent.[167]

The evidence did not support this assertion. Stevens identified the loans in May 2014, but he did not ask the Buyer to stop.[168] By September 2014, Stevens knew that the Buyer had loaned the Company roughly $2.5 million. He still did not ask the Buyer to stop.[169] Stevens "knew [the Company] needed the cash because [they were] burning it

---

[164] JX 65 § 2.2.

[165] JX 338 (chart of loans).

[166] *Id.* By January 2015, the cumulative principal on the loans was $3,785,000. Under an agreement dated January 1, 2015, the Company formalized a $6 million credit facility with the Buyer. JX 253; Bryan Tr. 661–62. The 5% interest rate was consistent with the Acquisition Agreement's requirement that "any cash injection made as a loan to the Company made by either [of the members] will bear interest at the rate of five percent per annum." JX 61 § 3.1.6. Seller Parent did not approve the loan agreement either.

[167] *See Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2013 WL 6327997 (Del. Ch. Dec. 4, 2013) (Strine, C.) (using hypothetical negotiation to measure damages).

[168] Stevens Tr. 190–91.

[169] *Id.* at 192; *see* Bryan Tr. 646–48.

fast."[170] If the Buyer had not made the loans, the Company "would have ground to a halt."[171] Stevens testified that he finally objected to the loans at the November 2014 Advisory Board meeting—the same meeting where Stevens learned that the Earn Out was unlikely to be paid.[172] Stevens does not appear to have objected again after November 2014.

Stevens's conduct undermines the Sellers' assertion that if they had known about the loans, they could have extracted concessions. Stevens knew about the loans, and he did not attempt to extract concessions. He understood that the loans benefitted the Company by keeping it afloat.

"Even if compensatory damages cannot be or have not been demonstrated, the breach of a contractual obligation often warrants an award of nominal damages."[173] "Nominal damages are not given as an equivalent for the wrong, but rather merely in recognition of a technical injury and by way of declaring the rights of the plaintiff."[174] They "are usually assessed in a trivial amount, selected simply for the purpose of declaring an

---

[170] Stevens Tr. 196.

[171] *Id.* at 199; *see id.* at 200 (confirming that "payroll would not have been met and the rent [at the Company's office] would not have been paid"); Bryan Tr. 649 ("Do you know what would have happened to the [Company] if the loans were not made? A. It would not have been able to pay the current payables or payrolls or other financial obligations as they arose? Q. What does that lead to? A. Failure. Bankruptcy."); Pedersen Dep. 168–69.

[172] Stevens Tr. 197.

[173] *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009).

[174] *Id.* (internal quotation marks omitted).

infraction of the Plaintiff's rights and the commission of a wrong."[175] This decision awards

one dollar to Seller Parent as nominal damages for the Buyer's breach of Section 2.2.

### 2.      Draft Annual Financials

The Summary Judgment Order ruled that the Buyer breached the Operating

Agreement because the Company's accountants failed to provide Seller Parent with "Draft

Annual Financials," a term defined in the Operating Agreement. Section 11.1(b) of the

Operating Agreement states:

> As soon as practicable, but in any event within ninety (90) calendar days
> following March 31st of any applicable calendar year, an independent
> accounting firm appointed by [the Buyer] and approved by [Seller Parent],
> which approval shall not be unreasonably withheld (the "***Independent
> Accountants***") shall prepare and deliver to the Company and the Members a
> copy of draft audited balance sheets and related statements of income and
> retained earnings and cash flows of the Company for fiscal year of the
> Company then ended ("***Draft Annual Financials***"). Each of the Members
> shall have forty-five (45) calendar days following receipt of such Draft
> Annual Financials to provide written notice to the other Members and the
> Company of its acceptance of, or disagreement with, the Draft Annual
> Financials, setting forth in reasonable detail the basis for such disagreement,
> if any.[176]

Seller Parent never received any Draft Annual Financials.[177] The Company's accountants

instead created final financial statements without Seller Parent's input, and Seller Parent

---

[175] *Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC*, 2005 WL 3502054, at *15 (Del. Ch. Dec. 15, 2005).

[176] JX 65 § 11.1(b).

[177] *Glidepath Ltd. v. Beumer Corp.*, 2018 WL 321788, at *1–3 (Del. Ch. Jan. 5, 2018) (ORDER).

received final statements for the years 2014, 2015, and 2016.[178]

As with the unauthorized loans, the Sellers do not argue that the failure to provide Draft Annual Financials resulted in actual, compensatory damages. They instead argue that if the Company had complied with the Operating Agreement, then Seller Parent could have withheld its approval of the Draft Annual Financials unless the Company followed the Acquisition Plan.

As with the unauthorized loans, the Sellers' conduct shows that they did not care about the lack of Draft Financial Statements. James Webber, an accountant who sat on Seller Parent's advisory board, testified that Seller Parent received "monthly board profit and loss accounts, and there would be no cause for [Seller Parent] to ask for draft audited financial statements. [Seller Parent] would have known the picture."[179] There also is no reason to think that the Sellers would have gained any leverage through Seller Parent's approval right. The Sellers bore the burden of proof on this point, but they tried to sidestep the issue by arguing that "doubts about the extent of damages are generally resolved against the breaching party."[180] That is a correct statement of law, but a plaintiff still must "prove the *fact* of damages with reasonable certainty."[181] The Sellers did not prove that they could

---

[178] Webber Dep. 70.

[179] *Id.*; *accord id.* at 71 ("[W]e didn't ask for draft financials. And we didn't discuss it.").

[180] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015).

[181] *Id.* at 1111; *see Fletcher*, 2013 WL 6327997, at *17 ("To prevail in a claim for damages for breach of contract, a plaintiff 'must show both the existence of damages

52

have extracted any business concessions by objecting to the Draft Annual Financials.

The Sellers take the view that if the court resolves doubts about the extent of damages against the Buyer, then they should receive as damages the full amount of the Contingent Consideration. There is no causal connection between the failure to provide Draft Annual Financial Statements and the underperformance of the Company's business. Instead, a larger causation problem looms: In November 2015, Stevens conceded that it was "an impossible mission" to achieve the Earn Out in three years.[182] In hindsight, he would have sought a five-year Earn Out Period.[183] The evidence showed that Stevens accurately diagnosed the problem. The Company achieved success at Denver and San Francisco after the Earn Out Period. If the period had been longer, then the Sellers might have received the Contingent Consideration.

In support of their contention that the Sellers would have received the Contingent

---

provable to a reasonable certainty, and that these damages flowed from defendant's violation of the contract.' In other words, a plaintiff 'must show that the injuries suffered are not speculative or uncertain and that the Court may make a reasonable estimate as to an amount of damages.'" (footnote omitted)).

[182] JX 316 at 2.

[183] *Id.* There is some evidence that the parties discussed a five-year earn-out period when they negotiated the transaction. The parties modeled the transaction documents on Buyer Parent's acquisition of a Belgian company. That deal involved a five-year earn out. Hufnagel Dep. 96–97; Hufnagel Tr. 805–06. Hufnagel testified that he offered a five-year earn-out but that Stevens insisted on three years. Hufnagel Tr. 764, 805–08, 848–49; *see also* JX 316 at 2 (Stevens referring to the "wisdom in [his] flippant 5 year earn-out"). Stevens denied receiving a five-year proposal from Hufnagel, and there is no contemporaneous documentary evidence regarding a five-year proposal. *See* Stevens Tr. 117–18.

Consideration if the Company had continued to focus on pure-play traditional projects, the Sellers relied on an expert witness who opined that the Company would have earned an additional $47.2 million in revenue during the Earn Out Period if it had bid on ten more projects.[184] The expert assumed a 25% win rate with an average contract value of $18.9 million.[185] The assumed contract value was more than 50% higher than the typical maximum value the Company historically had obtained ($12 million). Moreover, as the Sellers' witnesses conceded at trial, the Company did not have the resources to bid on or complete another ten projects.[186] To handle the hypothetical projects, the Company would have been forced to reallocate resources from the work it actually won, sacrificing its real-world projects.[187] The Sellers did not make a persuasive case that the Company could have

---

[184] JX 342 at 15. For context, the Company's 2014 revenue was $13,863,869. JX 252 at 16. In 2014, the Company took on $45,934,631 in new contracts, purchase orders, and approved change orders. After adjusting for the 2014 revenue, the Company's backlog at the end of 2014 was $37,825,923. "Backlog represents the amount of revenue the Company expects to realize from work to be performed on uncompleted projects in progress . . . and from contractual agreements on which work has not begun." *Id.* By contrast, at the end of 2013, the backlog was only $4,317,646. Given the gap between what the Buyer bought and what it achieved, it is a stretch to think a different strategy would have radically improved results.

[185] JX 342 at 15.

[186] Stevens Tr. 149–51; Graviet Tr. 288.

[187] *See* JX 346 at 22–24; Cowhey Tr. 455–57, 462; *see also* Stevens Tr. 168 ("Q. Please tell the Court how the [Company] could have performed both in Chicago and West Palm Beach on an overlapping schedule. A. I can't because Chicago wasn't contemplated on the acquisition business plan."). The Company's resource limitations were not confined to bonding; they included problems with personnel, logistics, and engineering. *See* JX 7 at 5; JX 106; JX 114 at 2; *see also* JX 2 at 2–3; JX 297 at 2.

achieved the results necessary to trigger the Contingent Consideration by following a different strategy.

Finally, the Sellers make the technical point that because they did not receive the Draft Annual Financials, it is impossible to determine Net Profit for purposes of calculating the Contingent Consideration, because the relevant formulas in the transaction documents use defined terms based on the financial statements. Thus, Section 3.2.2 of the Acquisition Agreement provides that the "Net Profit shall be calculated on the basis of the respective Final Audited Annual Accounts for the respective fiscal year."[188] Under Section 11.1(b) of the Operating Agreement, the Final Audited Annual Accounts are the Draft Annual Financials once Seller Parent has the opportunity to review them and resolve any objections through a dispute resolution process.[189] The Sellers argue that without Draft Annual Financials, there cannot be Final Audited Annual Accounts, and hence there can be no calculation of the Net Profit.

As a strictly logical matter, this reasoning is correct, which is why the Summary Judgment Order ruled in favor of the Sellers on their claim of breach. But it does not follow that any actual damages resulted from the failure to prepare the Draft Financial Statements. It remained possible to calculate the Net Profit based on the Company's books and records, and the parties litigated over whether the Company could have generated sufficient Net

---

[188] JX 61 § 3.2.2.

[189] JX 65 §§ 11.1(b), 12.13.

Profit to trigger the Contingent Consideration. As with the unapproved loans, the Sellers proved a breach of contract without proving compensable damages. They are again entitled to nominal damages of one dollar.

### 3. The Bank Balances

The Summary Judgment Order held that the Buyer failed to pay Seller Parent a component of the purchase price based on the Company's bank balance at specified dates. Section 3.1.3 of the Acquisition Payment required the Buyer to pay Seller Parent "$500,000, provided that [the Company's] bank balance is $500,000 or greater on March 31, 2014, and further provided that at the request of [the Buyer] (based on [the Buyer's] cash position) that payment may be delayed until 30 June."[190] Section 3.1.4 of the Acquisition Agreement required

> a further payment in the amount equal to the Company's bank balance at June 30, 2014, not to exceed $1,000,000, less any payment made pursuant to Section 3.1.3, and further provided that such payment may be delayed until the earliest date (a) the Purchaser has resolved its legal issue in Canada, or (b) September 30, 2014.[191]

As of June 30, 2014, the Company's bank balance was $377,282.57, but the Buyer failed to pay Seller Parent this amount.[192] Seller Parent remains entitled to this amount as part of its damages award.

Seller Parent is also entitled to pre-judgment interest. In Delaware, pre-judgment

---

[190] JX 61 § 3.1.3.

[191] *Id.* § 3.1.4.

[192] *Glidepath*, 2018 WL 321788, at *4–5.

interest is awarded as a matter of right.[193] Subject to the court's discretion, a party may also receive post-judgment interest until the date of payment.[194] Unless the parties have specified another rate by contract or the court determines that a different rate is warranted by the equities, the statutory rate serves as a guide.[195] Because the parties have not specified a different rate, this decision award pre- and post-judgment interest at the legal rate, which will fluctuate with changes in the underlying reference rate.[196]

The parties dispute whether the interest award should be simple or compound. "[C]ompanies neither borrow nor lend at simple interest rates."[197] The court has discretion to award compound interest, which is warranted here.[198] The court also has discretion to

---

[193] *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 485–87 (Del. 2011).

[194] *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 620–21 (Del. Ch. 2010).

[195] *See* 6 *Del. C.* § 2301(a) (establishing legal rate); *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988) ("While the legal rate of interest has historically been the benchmark for pre-judgment interest, a court of equity has broad discretion, subject to principles of fairness, in fixing the rate to be applied. In the Court of Chancery the legal rate is a mere guide, not an inflexible rule." (citations omitted)).

[196] *See Levey v. Brownstone Asset Mgmt., LP*, 2014 WL 4290192, at *1 (Del. Ch. Aug. 29, 2014) (explaining rationale for fluctuating rate).

[197] *Henke v. Trilithic Inc.*, 2005 WL 2899677, at *13 (Del. Ch. Oct. 28, 2005).

[198] *See Brandin v. Gottlieb*, 2000 WL 1005954, at *28–30 (Del. Ch. July 13, 2000) (Strine, V.C.) (explaining rationale for awarding compound interest instead of simple interest); *accord ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 929 (Del. Ch. 1999); *see also Smith v. Nu-West Indus.*, 2001 WL 50206, at *1 (Del. Ch. Jan. 12, 2001) (following *Brandin*). *But see Branin v. Stein Roe Inv. Counsel, LLC*, 2015 WL 4710321, at *8 (Del. Ch. July 31, 2015) (adhering to precedent construing 6 *Del. C.* § 2301 as permitting only simple interest).

select a compounding interval, which in this case will be quarterly.[199]

In a breach of contract case, interest runs from the date "when the effects of the breach would have first manifested themselves."[200] For purposes of calculating pre-judgment interest on the $377,282.57 judgment, the applicable date is September 30, 2014.

## D. The Exclusive Territory Provision

Finally, the Sellers contend that the Buyer breached a non-competition provision in the Operating Agreement by doing business in Canada. The Operating Agreement contained a non-competition provision, but it applied to the Sellers, not the Buyer.

Section 12.20.2 of the Operating Agreement states:

[Seller Parent] and Sir Stevens acknowledges and agrees [sic] that . . . the Company may and/or will engage in the business of designing, manufacturing and selling airport baggage handling system solutions (the "***Exclusive Business***") throughout the United States, the Bahamas and Mexico (the "***Exclusive Territory***") and that engagement by [Seller Parent], Sir Stevens or any of their respective Affiliates in the Exclusive Business or provision of products or services competitive with the Exclusive Business by any of them anywhere in the Exclusive Territory <u>other than</u> through the Company could cause irreparable damage to the Company and each of them. For so long as [Seller Parent] and Sir Stevens are parties to this Agreement and for a time period of two (2) calendar years thereafter (<u>provided</u>, that the obligations hereunder of the parties shall be extended by adding to such term

---

[199] *See Taylor v. Am. Specialty Retailing Gp., Inc.*, 2003 WL 21753752, at \*13 (Del. Ch. July 25, 2003) (applying quarterly compounding interval when awarding interest based on the legal rate "due to the fact that the legal rate of interest most nearly resembles a return on a bond, which typically compounds quarterly"); *accord One Va. Ave. Condo. Ass'n of Owners v. Reed*, 2005 WL 1924195, at \*15 (Del. Ch. Aug. 8, 2005). *But see* Charles K. Korsmo & Minor Myers, *Interest in Appraisal*, 42 J. Corp. L. 109, 129–30 (2016) (questioning validity of comparison between legal rate and bonds).

[200] *BTG Int'l Inc. v. Wellstat Therapeutics Corp.*, 188 A.3d 824, 2018 WL 2966941, at \*1 (Del. June 11, 2018) (TABLE).

the length of time, if any, during which any of them and/or their respective Affiliates shall be or remain in violation of their obligations under this Section 12.20 as finally determined by a court of competent jurisdiction), *neither [Seller Parent] (whether directly or through an Affiliate), Sir Stevens, nor any of their respective Affiliates shall, without the prior written consent of a Majority in Interest of the Members*, (i) *engage anywhere within the Exclusive Territory*, directly or indirectly, alone or as a stockholder (other than as a holder of less than 5% of the capital stock of any publicly-traded corporation), partner, officer, director, employee, consultant, independent contractor, agent or otherwise in or with any business organization other than the Company that is engaged in or becomes engaged in the Exclusive Business or otherwise competes with the Company in the Exclusive Business, (ii) solicit, divert, or in any way attempt to solicit, or divert, to any potential, current, past or prospective competitor of the Company in the Exclusive Business any customer of the Company or any of its affiliates that is located within the Exclusive territory, or (iii) solicit or encourage any officer, employee or consultant of the Company with substantial responsibilities for the Exclusive Business of the Company to leave their employ for employment by or with any of them or any of their respective Affiliate(s) or any competitor of the Company.[201]

The Acquisition Agreement contains a similar provision.[202] These provisions prohibited the Sellers from competing in the Exclusive Territory, defined as the United States, the Bahamas, and Mexico. The Exclusive Territory restrictions did not apply to the defendants. At most, the transaction documents suggest that the Company would operate chiefly in the Exclusive Territory, but they did not prevent the Company or the Buyer from operating in other regions.

---

[201] JX 65 § 12.20.2 (emphasis added).

[202] JX 61 § 7.4.1.

### III.    CONCLUSION

The Buyer is liable to Seller Parent for damages of $377,284.57, with pre- and post-judgment interest compounded quarterly. As part of a final order, judgment will be entered in favor of Seller Parent and against the Buyer in this amount, and otherwise against the plaintiffs and in favor of the defendants. Within ten business days, the parties shall submit a joint letter identifying any other issues that need to be resolved to bring this matter to a close at the trial level.